UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|   |   |   |
|---|---|---|
| DAVID PHIM, | ) | |
| Petitioner, | ) | |
| v. | ) | Civil No. 16-11100-LTS |
| DOUGLAS DEMOURA, | ) | |
| Respondent. | ) | |

MEMORANDUM AND ORDER ON PETITION FOR WRIT OF HABEAS CORPUS
AND PETITIONER'S MOTION FOR JUDGMENT ON THE PLEADINGS (DOC. NO. 34)

March 14, 2018

SOROKIN, J.

David Phim, a prisoner at the Massachusetts Correctional Institution in Concord, Massachusetts, has filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, in which he challenges his conviction for second-degree murder. Doc. No. 1.[1] The respondent answered the petition, Phim briefed the merits of his claims and moved for judgment on the pleadings, and the respondent opposed the motion. Doc. Nos. 13, 34-36. Because each of his federal claims is meritless, Phim's petition and motion for judgment on the pleadings are DENIED.

I. BACKGROUND

On August 20, 2009, following a jury trial in Middlesex County Superior Court, Phim was convicted of second-degree murder and three firearms charges. Doc. No. 1 at 1-2; see

---
[1] Documents available on the Court's electronic docket are cited using the docket number assigned by CM/ECF and the page number in the ECF header at the top of the document.

Commonwealth v. Phim, 969 N.E.2d 663, 666 (Mass. 2012). He received a life sentence. S.A. at 6, 586.[2]

The charges against Phim stemmed from a gang-related shooting in Lowell, Massachusetts. Phim, 969 N.E.2d at 665. The Supreme Judicial Court ("SJC") summarized the evidence adduced at Phim's trial as follows:

> On the evening of April 7, 2007, several bullets were fired into a window at 168 Fletcher Street in Lowell. One of those bullets hit Vuthavy Phay, a guest at a party being held at that house. Phay died from his injuries. At the time of the shooting, [Phim] was . . . dating . . . a resident of 168 Fletcher Street, Jennifer Chhea. Jennifer lived there with her parents and siblings. The oldest of her siblings, her brother John, was a member of the "Asian Boyz" gang. [Phim] was a member of a rival gang, "TRG Grey."
>
> The jury reasonably could have inferred that these rival gang affiliations were a source of tension between John and [Phim]. The jury heard testimony that John, as well as other family members, disapproved of Jennifer's relationship with [Phim], and would not allow [Phim] into their house. In her testimony, Jennifer suggested also that when John learned [Phim] had been in their house, he threatened [Phim] with physical harm.
>
> Less than a week before the murder, Jennifer told [Phim] that she had engaged in sexual relations with another man. On April 7, the day of the shooting, Jennifer told [Phim] that she was pregnant. [Phim] reacted angrily, throwing her on the bed and punching her.
>
> Later the same day, [Phim] met with his friend Roth Em, who had also previously dated Jennifer. Em had recently quarreled with Jennifer, expressing his disdain for her brother John's gang. At trial, Em testified that, on April 7, he, [Phim], and two other men [one of whom was Savong Moun] had gone together to Fletcher Street. Em stated that he and [Phim] walked up an alley behind 168 Fletcher Street. From the alley, [Phim] shot several rounds into one of the building's windows.
>
> If not himself the shooter, Em was the only percipient witness to the shooting. Jennifer's middle brother, Bunthorng, testified that he saw [Phim] with a gun outside the building immediately after the shooting.[3] However, Bunthorng heard,

---

[2] The respondent has filed a Supplemental Answer (cited herein as "S.A.") containing the state-court record in two bound volumes. See Doc. Nos. 16, 37.

[3] Footnote 3 to the SJC decision appears here, stating: "Bunthorng also testified at trial that he had, under oath, initially identified Em as being in possession of the gun."

2

> but did not see, the shots being fired, and therefore could not testify to whether it was Em or [Phim] who had fired the gun.

Id. at 665-66 (footnote 2 omitted).[4]

Phim's trial featured five days of evidence, including a view of the scene in Lowell and testimony by sixteen witnesses called by the Commonwealth. S.A. at 377-541. Only two witnesses testified that they had seen Phim at the scene of the shooting—Bunthorng Chhea and Roth Em—and the credibility of both witnesses was substantially challenged by Phim's counsel on cross-examination. S.A. at 408-21, 461-76. The Commonwealth also presented relatively brief testimony by an employee of Sprint who described records of phone calls occurring on the night of the shooting. S.A. at 504-07.

Two other men also were indicted and charged with participating in the murder. Commonwealth v. Phim, 41 N.E.3d 330 (Mass. App. Ct. 2015) (unpublished). One, Savong Moun, was tried separately a year after Phim, and was acquitted of murder "but convicted . . . of being an accessory after the fact to [Phim]'s murder of Phay, and of committing perjury before the grand jury." Id. The other, Roth Em, entered into a plea agreement pursuant to which the charge against him was reduced to manslaughter in exchange for his cooperation as a witness for the Commonwealth at his two co-defendants' trials. Id.

On June 14, 2012, the SJC affirmed Phim's conviction and sentence on direct review, rejecting various challenges which Phim does not repeat in his federal habeas petition. Phim 969 N.E.2d at 665-72. Phim filed a counseled motion for a new trial in the Superior Court in early 2013. S.A. at 9, 165-89. His motion raised two claims: 1) whether Bunthorng Chhea's

---

[4] Phim has not challenged the reasonableness of the factual determinations made by any state court considering his direct appeal or post-conviction claims. This Court presumes such determinations are correct for purposes of assessing a federal habeas petition. 28 U.S.C. § 2254(e)(1); Miller-El v. Cockrell, 537 U.S. 322, 340-41 (2003).

3

recantation, during Moun's trial, of his identification of Phim as the man he saw holding a gun after the shooting amounted to newly discovered evidence that cast doubt on the validity of Phim's conviction; and 2) whether the revelation during Moun's trial that site records for Moun's cell phone had been mislabeled, were available, and showed the location of his phone on the night of the murder demonstrated a disclosure violation by the government or ineffectiveness of Phim's trial counsel. S.A. at 176-88.

On July 10, 2014, the Superior Court denied Phim's motion in a decision containing the following additional factual summary:

> At [Phim's] trial, [Bunthorng] Chhea testified that he looked from his second floor bedroom window immediately after the gunfire stopped. He saw [Phim] and Em quickly leaving the scene. The streetlight enabled him to see the two men and to see [Phim] with a gun in his hand. Chhea knew both men.
>
> It was established at [Phim]'s trial that Chhea did not immediately report to the police that he knew the two men. However, within hours of the murder he revealed the name of [Phim] and identified Em with an initial, "B."[5] Chhea also identified both men from photo arrays and later testified at the grand jury where he placed the gun in Em's hand. His explanation for this latter inconsistency was his fear of [Phim]. Chhea's explanation was persuasive. Although Chhea was not a gang member he lived in a home frequented by his brother's fellow gang members, the Asian Boyz. [Phim] was a member of a rival gang.
>
> At Moun's trial, Chhea testified that he did not know the two people he observed from his window. However, he did testify that he initially denied any knowledge of the shooting but he admitted that he later told the police that he saw [Phim] carrying the gun and fleeing the scene with "B" after the shooting, that he selected photos of [Phim] and Em, and that he had previously testified to such.
>
> \*    \*    \*
>
> In the Moun trial, Moun called Vincent Moise ("Moise"), a former employee of Sprint Nextel . . . .[6] Moise testified concerning the location of various cellphones during the critical times surrounding the murder. . . . While the subscriber records for Moun's cellphone showed direct-connect calls to and from his phone at the

---

[5] Footnote 2 to the trial court's memorandum appears here, stating: "Em is sometimes referred to as "B."
[6] Moise is the same telecommunications witness who testified during Phim's trial.

pertinent times, no site records were provided to Moise. However, site records were provided for the interconnect calls to and from Moun's phone and Moise testified consistent with the available records.

After Moise completed his testimony, it was determined that Moun's direct-connect site records were available but they had been mislabeled. The evidence was reopened and Moise testified that all calls made and received on Moun's phone between 11:44 p.m. and 12:08 a.m. placed the location of Moun's phone in Lowell, about two miles from the murder scene. . . . Since it was documented that the body of the victim arrived at Lowell General Hospital at 11:55 p.m., the jury could have reasonably inferred that the shooting occurred within five to ten minutes prior to 11:55 p.m.[7]

S.A. at 84-85 (footnote 3 omitted). The Superior Court went on to find Chhea's recantation incredible, S.A. at 88, and that a fifteen-minute gap between calls logged on Moun's cell site records "would have been adequate" time "for Moun to travel to and from the murder scene consistent with Em's testimony," S.A. at 89.

The Massachusetts Appeal Court ("MAC") affirmed the Superior Court's denial of Phim's motion for a new trial on December 3, 2015. Phim, 41 N.E.3d at 330. The SJC denied further review. S.A. at 279. Phim timely filed his habeas petition in June 2016. Doc. No. 1. His petition, read in light of the brief he submitted in support of his motion for judgment on the pleadings, Doc. No. 34, raises three claims:

1) Ineffectiveness of trial counsel for failing to use Moun's cell phone records to impeach Em's testimony as to the timing and sequence of events around the time of the shooting;

2) A violation by the Commonwealth of its obligations pursuant to Brady v. Maryland, 373 U.S. 83 (1963), for failing to disclose or accurately label Moun's cell site records in advance of Phim's trial; and

3) A Due Process violation arising from Bunthorng Chhea's testimony, which Chhea later recanted, and which the Commonwealth offered knowing it was false.

---

[7] Based on these site records, "Moun's counsel argued that Moun could not have participated in the murder because he would have had only fifteen minutes in which to leave a location that was two miles away from 168 Fletcher Street, travel to the vicinity of the shooting, and then drive back to his prior location." Phim, 41 N.E.3d at 330.

5

Doc. No. 1 at 5, 7; Doc. No. 34 at 2, 10-23. The respondent opposed Phim's petition and the related motion for judgment on the pleadings, arguing each of his federal claims is meritless. Doc. No. 35.

II.   LEGAL STANDARDS

   A.   General Habeas Review

Federal district courts may not grant a writ of habeas corpus unless they find that the state court's adjudication of the petitioner's claims "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[,] or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). State court decisions merit substantial deference, resulting in a federal habeas corpus standard that is "difficult to meet," with the petitioner carrying a heavy burden of proof. Harrington v. Richter, 562 U.S. 86, 102 (2011); accord Cullen v. Pinholster, 563 U.S. 170, 181 (2011); see Burt v. Titlow, 571 U.S. 10, 134 S. Ct. 10, 15-16 (2013) (emphasizing the "formidable barrier" faced by federal habeas petitioner where claims already were adjudicated in state court, and limiting relief to cases of "extreme malfunctions" by state criminal justice systems). If a state court's decision "was reasonable, it cannot be disturbed" on habeas review. Hardy v. Cross, 565 U.S. 65, 72 (2011) (per curiam); see Renico v. Lett, 559 U.S. 766, 779 (2010) (admonishing federal habeas courts not to "second-guess the reasonable decisions of state courts").

A state court ruling is "contrary to" clearly established Supreme Court precedent "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "if the state court confronts a set of facts that are materially indistinguishable from a decision

6

of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000). The state court is not required to cite, or even have an awareness of, governing Supreme Court precedents, "so long as neither the reasoning nor the result of [its] decision contradicts them." Early v. Packer, 537 U.S. 3, 8 (2002).

For a habeas petitioner to prevail under this exacting standard, the state court judgment must contradict clearly established holdings of the Supreme Court, not merely law articulated by a lower federal court, and not dicta of any court. Williams, 529 U.S. at 404-05; accord Woods v. Donald, 135 S. Ct. 1372, 1376 (2015) (per curiam); Knowles v. Mirzayance, 556 U.S. 111, 122 (2009). The Supreme Court has "repeatedly emphasized" that "circuit precedent does not constitute 'clearly established Federal law'" for purposes of § 2254(d)(1). Glebe v. Frost, 135 S. Ct. 429, 431 (2014); see also, e.g., Marshall v. Rodgers, 569 U.S. 58, 64 (2013) (warning against using circuit precedent to "refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced").

A state court decision constitutes an "unreasonable application" of Supreme Court precedent if it identifies the correct governing legal rule, but "unreasonably applies it to the facts of the particular state prisoner's case." Williams, 529 U.S. at 407-08. When making the "unreasonable application" inquiry, federal habeas courts must determine "whether the state court's application of clearly established federal law was objectively unreasonable." Id. at 409. A state court's decision not "to apply a specific legal rule that has not been squarely established by [the Supreme Court]" cannot amount to an unreasonable application of federal law for § 2254(d)(1) purposes. Mirzayance, 556 U.S. at 122. "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).

A showing of clear error is not sufficient for a habeas petitioner to establish entitlement to relief. Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003); accord McCambridge v. Hall, 303 F.3d 24, 36-37 (1st Cir. 2002) (en banc). Relief is available only where a state court's "determination was unreasonable – a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007); accord Brown v. Ruane, 630 F.3d 62, 67 (1st Cir. 2011); see also Cavazos v. Smith, 565 U.S. 1, 2 (2011) (per curiam) (emphasizing that a habeas court "may not overturn a state court decision . . . simply because the federal court disagrees with [it]"); Richter, 562 U.S. at 103 (requiring a petitioner to "show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement"). Put another way, habeas relief is warranted only if a petitioner shows that the state court's rejection of his claim was "so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate that it is outside the universe of plausible, credible options." Sanna v. Dipaolo, 265 F.3d 1, 13 (1st Cir. 2001) (quotation marks omitted).

B.  Ineffectiveness of Counsel

In order to establish that his counsel was constitutionally ineffective, a defendant must satisfy the test set forth in Strickland v. Washington, 466 U.S. 668 (1984), which provides the "clearly established federal law governing" such claims. Jewett v. Brady, 634 F.3d 67, 75 (1st Cir. 2011). "First, the defendant must show counsel's performance was deficient," which requires showing "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." Strickland, 466 U.S. at 687. "Second, the defendant must show the deficient performance prejudiced the defense." Id. "Unless a defendant makes both showings, it cannot be said that the conviction or . . . sentence resulted

from a breakdown in the adversary process that renders the result unreliable." Id. "Surmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 559 U.S. 356, 371 (2010); accord Richter, 562 U.S. at 105. This is especially so in the context of habeas review, where counsel ineffectiveness claims are subject to a "'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt." Titlow, 134 S. Ct. at 13 (quoting Pinholster, 563 U.S. at 190); see Jewett, 634 F.3d at 75 (explaining "pivotal question" is not whether the petitioner has met the Strickland standard in the first instance, but whether "fairminded jurists would all agree that the [state court's] decision [that he has not met it] was unreasonable").

Counsel's performance is measured objectively, considering only what is "reasonable[] under prevailing professional norms." Strickland, 466 U.S. at 687-88; accord Premo v. Moore, 562 U.S. 115, 122 (2011). Federal courts must be "highly deferential" and "indulge a strong presumption" that counsel's challenged actions might be considered sound strategy under the circumstances. Strickland, 466 U.S. at 689; accord Mirzayance, 556 U.S. at 124. "It is '[r]are' that constitutionally competent representation will require 'any one technique or approach.'" Pinholster, 563 U.S. at 195 (quoting Richter, 562 U.S. at 106). A strategic choice "made after thorough investigation of law and facts relevant to plausible options [is] virtually unchallengeable." Strickland, 466 U.S. at 690.

To establish prejudice, a defendant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694; accord Mirzayance, 556 U.S. at 127. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." Strickland, 466 U.S. at 693. To warrant

9

relief, a defendant must show that counsel's errors were "so serious as to deprive [him] of . . . a trial whose result is reliable." Id. at 687. Because "the Strickland standard is a very general one, . . . state courts have considerable leeway in applying it to individual cases." Jewett, 634 F.3d at 75.

III. DISCUSSION

    A.    Claim 1: Counsel Ineffectiveness

Phim first claims that he was denied the effective assistance of counsel when his lawyer failed "to use and present" Moun's cell site records, which he urges were "exculpatory material" that would have impeached Em's testimony about the sequence of events around the time of the shooting, and about whether Phim was present for those events.[8] Doc. No. 1 at 7; Doc. No. 34 at 10-12. He claims the cell site records that were discovered during Moun's trial "would have opened an entirely new line of cross-examination and impeachment of Em" regarding his "ability and opportunity to accurately observe the person . . . who fired the shots into the apartment." Doc. No. 34 at 11.

The respondent disagrees, arguing Phim cannot establish either of Strickland's two prongs. First, the respondent posits that trial counsel "was not deficient . . . where he could not have known about the existence of the records because they had been mislabeled by the

---

[8] In his petition, Phim stated a second version of his counsel-ineffectiveness claim, asserting counsel failed to call an expert to respond to testimony by a Commonwealth expert that "cell site records placed [Phim] at the scene." Doc. No. 1 at 5. Such a claim is not supported factually, as the trial record reflects no such testimony by the relevant Commonwealth witness nor any argument to that effect from the prosecutor, see S.A. at 548-51 (reflecting only reference to phone records in closing argument was to records contradicting Phim's claim to police that he was in Boston at the time of the shooting), nor would it be supported legally, as counsel could not be ineffective for failing to rebut expert testimony that was not actually offered. Perhaps recognizing these flaws, Phim has not included this basis for his counsel-ineffectiveness claim in his merits briefing.

10

Commonwealth and the mistake was not realized until Moun's subsequent trial." Doc. No. 35 at 14. Second, the respondent argues Phim cannot show the records would have changed the jury's verdict. Id. at 11-12, 14.

The MAC rejected Phim's counsel-ineffectiveness claim, concluding he had not established that the cell site records for Moun's phone "would have been material in the context of his trial." Phim, 41 N.E.3d at 330. In so ruling, the MAC endorsed the conclusions of the Superior Court that the "case against [Phim] did not depend upon Moun being with [Phim] when the shots were fired," whereas Moun's conviction as an accessory necessarily turned on his "jury finding that [Phim] committed the murder." Id. The MAC also cited the Superior Court's finding "that fifteen minutes would have been an adequate period of time for Moun to" drive to and from the area of the shooting, assuming he began and ended at a location in the area reflected in his cell site records. Id. at 330 & n.3.[9]

The state courts' resolution of Phim's challenge to his trial counsel's performance was neither contrary to, nor an unreasonable application of, Strickland. Even assuming a reasonably competent lawyer would have detected the Commonwealth's mistake, recognized Moun's cell site records despite their mislabeling, and used those records at Phim's trial to impeach Em and/or to advance an alibi defense,[10] the state courts reasonably considered the records in the

---

[9] Each of these determinations was made by the Superior Court in the context of its assessment of Phim's counsel-ineffectiveness claim and, specifically, whether he had established prejudice. S.A. at 89 & n.4 (citing Commonwealth v. Saferian, 315 N.E.2d 878 (Mass. 1974); see Ouber v. Guarino, 293 F.3d 19, 32 (1st Cir. 2002) (describing Saferian as "a functional equivalent of Strickland").

[10] Each of these is a generous assumption, particularly since Phim has not argued, let alone pointed to facts showing, that such assumptions are justified here. For example, although Phim's petition references an "overwhelming alibi which placed him 2 ½ miles away from the crime scene" that he believes would have been bolstered by use of the cell site records, Doc. No. 1 at 7, Phim did not pursue an alibi defense at trial (overwhelming or otherwise), and he has neither

11

context of the other evidence offered against Phim and concluded he had not demonstrated the records would have changed the outcome of his trial. This conclusion is both consistent with the <u>Strickland</u> standard for assessing counsel-ineffectiveness claims, and supported by the record.

Phim has offered no evidence—let alone clear and convincing evidence—to undermine the state courts' factual finding that a fifteen-minute window of time between calls logged on Moun's cell site records provided sufficient time for Moun (and, with him, Phim) to travel to and from the crime scene.[11] This Court, therefore, is bound by that finding. That fact, coupled with the finding of Moun's jury that Phim had been the shooter, and considered in light of Phim's decision not to pursue an alibi defense during his trial (a strategic decision for which he does not fault trial counsel here), eviscerates Phim's claim of prejudice regarding a potential alibi defense.

To the extent Phim asserts that the cell site records could have further impeached Em, Phim's lawyer vigorously cross-examined Em at trial, including on his ability to recall and describe the relevant sequence of events, on discrepancies within his version of events, and on whether the person with him at the scene of the shooting was actually someone other than Phim. S.A. at 466-77. Thus, there is no basis to conclude that the cell site records would have provided "an entirely new line of . . . impeachment" of Em. Doc. No. 34 at 11. Moreover, the finding that fifteen minutes was sufficient time to drive to and from the scene also undermines Phim's claim that the cell site records would have meaningfully altered counsel's ability to cross-examine Em.

Thus, Phim's claim that the mislabeled cell site records rendered his trial counsel's performance constitutionally ineffective is meritless.

---

alleged nor established that his decision not to advance such a defense depended on the presence or absence of cell site records for Moun's phone.

[11] In fact, Phim concedes that it would "not [be] impossible to cover" the relevant "distances in 15 minutes," simply arguing that doing so is not "probable or practicable." Doc. No. 34 at 16.

B.  Claim 2: Brady Violation

Phim relies on the same mislabeled cell site records to claim that the Commonwealth violated its disclosure obligations under Brady.[12] Doc. No. 34 at 13-20.  He argues that "[t]imely disclosure of . . . Moun's cell phone records would have resulted in a markedly weaker case for the prosecution, and a stronger one for" Phim.  Id. at 13.  The MAC, says Phim, applied a "standard of materiality" that is "contrary to" Kyles v. Whitley, 514 U.S. 419 (1995).  Doc. No. 34 at 13.  Again, Phim's argument hinges on his view that the mislabeled cell site records would have impeached Em's testimony identifying Phim as the shooter.  Id. at 14-16, 18.

The respondent urges that the cell site records "were not exculpatory or impeaching," and that Phim has not shown "a reasonable probability of a different result if the records had been admitted at his trial."  Doc. No. 35 at 12.  In support, the respondent cites the same facts discussed above regarding the prejudice component of Phim's counsel-ineffectiveness claim.  Id. at 11-12.

The MAC rejected Phim's claims arising from the cell phone records—including the counsel-ineffectiveness claim and the Brady claim—for the same reason.[13]  Phim, 41 N.E.3d at 330.  Incorporating the same facts and conclusions from the Superior Court's decision that are

---

[12] Phim's suggestion that trial counsel rendered deficient performance in failing to use the relevant cell site records is in conflict with his separate argument that the records were mislabeled by the Commonwealth and, thereby, were not disclosed to Phim's counsel. Regardless whether fault is assigned to trial counsel or the Commonwealth for the absence of Moun's cell site records at Phim's trial, Phim has not established he was deprived of a fair trial.
[13] Phim says "it is not exactly clear whether the [MAC] adjudicated his Brady claim on the merits." Doc. No. 34 at 13.  The MAC, however, explicitly acknowledged and rejected his allegation of a Brady violation.  Phim, 41 N.E.3d at 330.  This is sufficient to constitute a decision on the merits entitled to deference for purposes of federal habeas review.  See Richter, 562 U.S. at 100 (stating "§ 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits'" and entitled to deference); see also Johnson v. Williams, 568 U.S. 289, 300 (2013).

13

enumerated in the previous section, the MAC found that, "regardless of how the issue is characterized, the defendant was required to establish that the records would have been material in the context of his trial," and the Superior Court "did not abuse [its] discretion in concluding that he failed to do so." Id.

The MAC's determination was neither contrary to, nor an unreasonable application of, Brady, Kyles, or any other clearly established federal law. Brady requires prosecutors to produce "evidence favorable to an accused upon request . . . where the evidence is material either to guilt or to punishment." 373 U.S. at 87. For evidence to fall within the scope of that disclosure requirement, it must be "favorable to the accused, either because it is exculpatory, or because it is impeaching, . . . and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82 (1999). "[T]here is never a real 'Brady violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." Id. at 281; accord Kyles, 514 U.S. at 421-22.

The same reasons that supported a finding that Phim's had not shown Strickland prejudice also justify rejecting his Brady claim. Even assuming that the cell site records constitute "favorable" evidence for purposes of Brady, Phim has not established a reasonable probability that the phone records would have yielded a different verdict. The reasonableness of the MAC's determination in this regard is amply supported by the state courts' finding that the timing and location of calls reflected in the records would not have precluded Moun (and Phim) from being at or near the crime scene at the time of the shooting; the fact that Phim's guilt did not necessarily depend on Moun's location; the fact that Moun's jury concluded Phim had been

14

the shooter even after hearing about the relevant call records; and the extent to which Em's testimony was challenged even without the records.[14]

Because the state courts' rejection of Phim's Brady claim was well within "the universe of plausible, credible options," Phim is not entitled to habeas relief. Sanna, 265 F.3d at 13.

    C.        Claim 3: Witness Recantation

Finally, Phim asserts a claim arising from the fact that Bunthorng Chhea recanted his identification of Phim when he later testified at Moun's trial.[15] Doc. No. 34 at 20-23. He argues that the "prosecutor knowingly used . . . false testimony to obtain his conviction," says Chhea's recantation "is probative of [Phim]'s innocence," and faults the state courts for rejecting his challenge to that testimony without holding an evidentiary hearing. Id.

The respondent ignores the prosecutorial misconduct component of Phim's claim—perhaps because Phim raised no such federal due process claim arising from the recantation in state court. See S.A. at 64-71, 176-81, 302-05. As to the recantation claim Phim did properly exhaust, the respondent argues there is no clearly established federal law governing such a claim. Doc. No. 35 at 15-17. In addition, the respondent notes that the state court found Chhea's recantation incredible, citing the various other instances in which he had identified Phim as the

---

[14] Phim characterizes Em's testimony as "uncorroborated and essential to [Phim's] conviction," and cites First Circuit decisions he interprets as mandating a finding of prejudice where evidence is withheld that could have impeached such a witness. Doc. No. 34 at 19-20. The record, however, does not support Phim's characterization. Although no other witness testified to having seen Phim shoot at the apartment, there was circumstantial evidence a jury could have found corroborated Em's testimony. For example, Bunthorng Chhea testified he saw Phim with a gun moments after the shooting; Jennifer Chhea testified she had seen Phim with a gun on another occasion and that she had angered him earlier that night; and Bunthorng Chhea and Em separately identified Phim as the shooter in interviews with police soon after the crime and at times when neither could have known that the other had (or would) identify Phim.
[15] This claim is not included in Phim's petition, but the Court will address it because the respondent did not argue it was waived, and because Phim presented a version of this claim in state court.

15

person he saw with the gun, as well as the fact that Phim's jury had heard about an instance before the trial when Chhea said Em had been the one with the gun. Id.

The MAC rejected Phim's claim, concluding the Superior Court "had ample reason to find that the recantation was of no value." Phim, 41 N.E.3d at 330. One especially powerful detail supporting this conclusion, according to both the Superior Court and the MAC, was the fact that the jurors who convicted Moun of being an accessory to the murder in question necessarily had concluded that Phim was the shooter, even after hearing Chhea's recantation which forms the basis for Phim's challenge here. Id.; S.A. at 88-89.

As to this claim, Phim has cited no basis for concluding that the prosecutor in his case knowingly elicited false testimony, the state courts made no such finding (because Phim did not pursue this claim there), and the record provides no support for such a finding. Thus, although there is clearly established federal law prohibiting prosecutors from knowingly eliciting perjured testimony, Phim has offered no support for his attempt to invoke that law for the first time in this Court. Moreover, he has not identified any other "clearly established Federal law, as determined by the Supreme Court of the United States" that he claims the MAC has contravened. § 2254(d). His failure to do so is fatal to his claim.

Even if the Court were to construe the recantation claim as a general due process claim (despite his failure to exhaust such a claim), Phim has not established that Chhea's subsequent recantation means his original testimony "so infected [Phim's] trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974). The circumstances presented here—including the Superior Court's finding that the recantation was not credible, the Moun jury's apparent rejection of the recantation, and the Phim jury's awareness of Chhea's reluctance to testify as well as his previous identification of Em as

16

the man holding the gun—do not establish a federal constitutional violation that would warrant relief. As such, the recantation claim, however it is interpreted, fails.

D. Request for Evidentiary Hearing

Finally, Phim urges that he "is entitled to an evidentiary hearing" because his second and third claims are "colorable," and he was not "accorded a state evidentiary hearing." Doc. No. 34 at 23. Those assertions are not pertinent to the standards governing whether this Court is required (or even permitted) to hold an evidentiary hearing on Phim's claims. Because the state courts "adjudicated [Phim's claims] on the merits," this Court's review is conducted pursuant to § 2254(d)(1), which "requires an examination of the state-court decision at the time it was made" and correspondingly limits the record for habeas purposes "to the record in existence at that same time, i.e., the record before the state court." Pinholster, 563 U.S. at 181-82; accord Atkins v. Clarke, 642 F.3d 47, 49 (1st Cir. 2011). Phim's submissions generally acknowledge that § 2254(d)(1) controls this Court's review of his claims.[16] See Doc. No. 34 at 11 (arguing state courts' rejection of his counsel-ineffectiveness claim was "contrary to" Strickland); id. at 13 (arguing MAC's disposition of his Brady claim was "contrary to federal law" such as Kyles).

In these circumstances, no evidentiary hearing is warranted. Pinholster, 563 U.S. at 181-82; see Schriro v. Landrigan, 550 U.S. 465, 474 (2007) (explaining evidentiary hearing not

---

[16] He summarily asserts that, to the extent the state courts made factual determinations contrary to his own description of the facts, such determinations were "necessarily . . . unreasonable" and "are not entitled to any presumption of correctnes[s]." Doc. No. 34 at 24. But elsewhere Phim explicitly endorsed the SJC's factual recitation, only supplementing it by describing the "newly discovered exculpatory material revelation[s]" that occurred during Moun's trial. Id. at 2-3. His description of those revelations is consistent with the state courts' recitation of the same facts on post-conviction review. Phim has not provided clear and convincing evidence to rebut the presumption of correctness this Court is required to apply to any "determination of a factual issue made by a State court." § 2254(e)(1).

17

required "if the record refutes the [petitioner's] factual allegations or otherwise precludes habeas relief"); Teti v. Bender, 507 F.3d 50, 62 (1st Cir. 2007) (same).

IV. CONCLUSION

Because his claims are meritless, Phim's habeas petition (Doc. No. 1) and his motion for judgment on the pleadings (Doc. No. 34) are DENIED.[17]

SO ORDERED.

/s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge

---

[17] Because "reasonable jurists" could not "debate whether . . . the petition should have been resolved in a different manner," Slack v. McDaniel, 529 U.S. 473, 484 (2000), and based on the circumstances described above, no certificate of appealability shall issue. The record of Phim's trial and the disposition of his post-conviction claims demonstrates the reasonableness of the state courts' conclusions that neither of the "newly discovered" items identified by Phim give rise to a meritorious federal constitutional claim.